*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RICHARD J. VILLARS, | ) | |
| | ) | Supreme Court No. S-15280 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-07-02606 CI |
| v. | ) | |
| | ) | O P I N I O N |
| OLGA H. VILLARS, | ) | |
| | ) | No. 6964 – October 31, 2014 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Douglas Blankenship, Judge.

Appearances: Richard J. Villars, pro se, Marrero, Louisiana, Appellant. No appearance by Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

## I.    INTRODUCTION

Richard and Olga Villars were married in Ukraine in 2004. Richard, who is a U.S. citizen, signed a Form I-864 affidavit of support in which he agreed to maintain Olga and her daughter, Linda, at 125% of the applicable federal poverty rate. Olga and

Linda came to Alaska, and Richard and Olga later divorced. For several years Richard and Olga have been litigating Richard's I-864 support obligation.

After a previous appeal by Olga regarding Richard's obligation for the first eleven months of 2010, we remanded the case to the superior court to resolve Richard's obligation for that period, which is no longer at issue.

The parties have continued to dispute Richard's I-864 obligations for 2009, December 2010, and all of 2011, 2012, and 2013. Following a series of hearings and orders in the superior court relating to these years, Richard filed this appeal, alleging a variety of errors by the superior court regarding its calculations of his obligations and potential offsets against those obligations. Because the superior court properly rejected Richard's attempt to relitigate issues resolved in earlier proceedings, we affirm the superior court's orders rejecting those claims. We remand for further factual findings on issues not yet resolved.

## II. FACTS AND PROCEEDINGS

### A. Facts And Proceedings Related To The First Appeal

Many of the relevant facts in this case are the same as those in the previous case involving the same parties, *Villars v. Villars* (*Villars I*).[1] Our decision in that case provides much of the factual background relevant to the present appeal:

> Richard and Olga were married in December 2004 in Kiev, Ukraine. Olga moved to Alaska in July 2005 with her minor daughter, Linda, to be with Richard. As Olga's immigration sponsor, Richard filed an INS Form I-864 affidavit of support, in which he agreed to maintain Olga and Linda "at

---

[1]    305 P.3d 321 (Alaska 2013). A third case by the same name involved the same former husband but a different former wife. *See Villars v. Villars*, 277 P.3d 763 (Alaska 2012). Because the 2012 case is of limited relevance here, we denote the 2013 case *Villars I*.

an income that is at least 125 percent of the Federal poverty guidelines."[2]

Richard and Olga divorced on January 12, 2009. Their divorce decree incorporated Richard's support obligations under his I-864 affidavit and calculated monthly payments based on the federal poverty level for a two-person household in Alaska.

On February 22, 2009, Olga and Linda moved to California. There Olga married George Nasif on October 18, 2009. Olga's daughter Linda moved to Louisiana to live with Richard from December 2009 until June 14, 2010, under a temporary guardianship agreement.

Olga's home life was unsettled during 2010, the only year at issue here. She and George maintained separate residences for much of the year; at one point George secured a restraining order against her. Olga was evicted from her apartment in April and moved into a motel, where she lived for several months until moving into another apartment with George and Linda. Olga's marriage to George was annulled in November 2010.

Richard did not make any support payments to Olga for the first eleven months of 2010. Olga filed a motion in Alaska to enforce the divorce decree, and Richard made payments for December 2010 and January 2011 pursuant to a temporary support order. His obligations for the first eleven months of 2010 were resolved at trial. . . .

Trial was held in superior court in Fairbanks in February 2011; both parties attended telephonically. After hearing from Richard, Olga, and George, the court made written findings of fact and conclusions of law. The court first ruled that Richard's 2010 support payments should be determined by the federal poverty level in California, not Alaska. The court ruled further that the payments would be determined by

---

[2]   *See* 8 U.S.C. § 1183a (2012).

the federal poverty level for a single-person household, not a two-person household, for the months Linda was living with Richard. Finally, the court ruled that Richard's support obligation would be offset by the amount of support that George provided to Olga and Linda during 2010. With some inconsistencies . . . , George testified at trial that his 2010 income was approximately $24,000, and that he spent this entire amount to support Olga, Linda, and himself. The trial court credited this testimony and calculated an offset assuming that all of George's income went to pay all of the family's living expenses. Accordingly, the trial court divided George's income evenly between him and Olga for the months Linda was away and among the three of them for the months she was there, for a total of $14,202.80 in support from George for Olga and Linda.

After a few other minor adjustments — $175 in income that Olga made in a few days of work and $275.90 "at minimum" in qualifying support that Richard paid toward the end of the year — the trial court found that Richard owed no further support for 2010. . . .

On appeal, Olga raise[d] many objections to the trial court's findings . . . . Olga challenge[d] the trial court's decision to account for California's lower federal poverty rate and for Linda's absence from the household for part of the year when calculating Richard's support obligations. She challenge[d] the trial court's use of George's support to offset Richard's support obligation. She also contest[ed] the trial court's finding as to the amount of support that George provided. Olga also argue[d] that the income she earned in 2010 should not be used to offset Richard's obligations.[3]

We concluded in *Villars I* that the superior court correctly adjusted Richard's support obligations to account for Olga's move to California, Linda's

---

[3] *Villars I*, 305 P.3d at 323-24 (footnote omitted).

temporary absence from Olga's household, and Olga's earnings.[4]  We noted that the findings of fact and conclusions of law accompanying the couple's 2009 divorce decree "incorporated Richard's support obligations under the INS Form I-864 affidavit and stipulated that this obligation was governed by federal law,"[5] which required Richard to maintain Olga and Linda "at an annual income that is not less than 125 percent of the Federal poverty line."[6]  Remarking that "a sponsor is required to pay only the difference between the sponsored non-citizen's income and . . . 125% of [the] poverty threshold,"[7] and citing federal court precedent as indicating that "a sponsor's support obligations must be adjusted downward when a family member leaves the household,"[8] we concluded that the superior court properly reduced Richard's support obligations to account for the time Linda lived with Richard instead of with Olga.[9]

We also determined in *Villars I* that the superior court erred in calculating the contributions of support by George, Olga's new husband, to Olga and Linda.  We remarked that "George testified, in apparent contradiction, that (1) he contributed $24,000 to the support of Olga and Linda during 2010, and (2) that his entire earnings

---

[4]  *Id.* at 325.

[5]  *Id.*

[6]  *Id.* (quoting  8 U.S.C. § 1183a(a)(1)(A)).

[7]  *Id.* (quoting *Barnett v. Barnett*, 238 P.3d 594, 598 (Alaska 2010)) (internal quotation marks omitted).

[8]  *Id.* (citing *Nasir v. Shah*, No. 2:10-cv-01003,  2012 WL 4342986, at *3-4 (S.D. Ohio Sept. 21, 2012); *Stump v. Stump*, No. 1:04-CV-253-TS, 2005 WL 2757329, at *6 (N.D. Ind. Oct. 25, 2005)).

[9]  *Id.*

for 2010 were $24,000, of which some went to his own support."[10] Observing that George's support was "sporadic and variable due to the significant disruptions in their living arrangements during [2010]," we concluded that the superior court's approximation of George's contributions was not sufficiently precise and remanded for a more accurate calculation.[11]

On remand,[12] the superior court calculated more precisely the qualifying support that Olga received in 2010. The superior court looked to Olga's wages, the support she received from George for various expenses, and the support she received from Richard. It determined that these resources exceeded the amount that Richard was obligated to provide pursuant to his I-864 affidavit and concluded that Richard had no further obligation to Olga for 2010.

Although the parties had begun to litigate Richard's obligations for years other than 2010 before *Villars I* was decided, that case addressed Richard's obligations only for 2010 — indeed only for the first eleven months of that year.[13] The present appeal relates to Richard's obligations for 2009, the last month of 2010, and 2011, 2012, and 2013.

---

[10]    *Id.* at 326.

[11]    *Id.* at 326-27. Olga also argued in *Villars I* that the superior court erred in its evidentiary rulings and that it denied her due process. *Id.* at 324. We concluded that Olga's evidentiary claims were moot, *id.* at 327 n.15, and rejected her due process arguments. *Id.* at 327-28.

[12]    *Villars v. Villars*, No. 4FA-07-02606 CI (Alaska Super., June 3, 2014).

[13]    *See Villars I*, 305 P.3d at 323-24. Richard now seeks reimbursement for the amount he paid Olga for December 2010 — a matter not addressed in *Villars I*.

**B. The Superior Court's March 29, 2011 Order Regarding Richard's Post-2010 Obligations**

In the superior court's March 29, 2011 order concluding that Richard owed Olga nothing further for 2010, which was the basis for Olga's appeal in *Villars I*, the superior court also calculated Richard's obligations for 2011 and future years.[14] For 2011 the superior court determined that Richard should provide Olga 125% of the applicable federal poverty guideline for a family of two persons, or $1,532.29 per month. For future years, the superior court directed the parties to calculate Richard's support obligation on their own, using the applicable federal poverty guidelines minus offsets.

**C. The Parties Dispute Richard's Post-2010 Obligations; Richard Attempts To Secure Partial Reimbursement Of His 2011 Payments.**

Throughout 2012 and the spring of 2013, Olga filed various motions asking the superior court to order Richard to make support payments to her. Olga framed her motions in terms of enforcement of the divorce decree provisions regarding Richard's I-864 support obligations, and also in terms of enforcement of the superior court's orders since the divorce. Richard opposed Olga's motions and in April 2013 filed a motion of his own seeking reimbursement of a portion of his support payments for 2011; he alleged that Olga earned income in 2011 but failed to disclose it, causing him to overpay her by $4,163.60.

**D. The Superior Court's June 20, 2013 Order Attempting To Settle Richard's 2013 Obligation And Rejecting Richard's Request For Partial Reimbursement Of His 2011 Payments**

The superior court issued various orders regarding Richard's support obligations for years other than 2010, some while *Villars I* was pending. In May 2013

---

[14] According to the divorce decree, absent a change in the applicable federal law, Richard's support obligation pursuant to his I-864 affidavit will end on December 18, 2014.

the superior court held a hearing on the motions filed as of that time and not yet resolved, and on June 20 it issued the order that is the main source of the present appeal.

In its June 20 order the superior court recounted the findings of fact incorporated into the divorce decree and noted that the parties stipulated to those findings. The order included the finding that Richard signed an I-864 affidavit in which he "agree[d] to pay the sponsored immigrant(s) whatever support is necessary to maintain the sponsored immigrant(s) at an income that is at least 125 percent of the Federal Poverty Guidelines."

The superior court also observed that in early 2013 Richard unilaterally reduced his 2013 payments based on his assumption of what Olga's household earnings would be for that year. The superior court considered Richard's recalculation to be "an effort to minimize his obligation by imputing a mitigation responsibility to [Olga]," a responsibility that the superior court concluded was incompatible with the purpose of the I-864 scheme. The superior court determined that based on the 2013 federal poverty guidelines, Richard's annual obligation for 2013 was $19,387.50, or $1,615.63 monthly (before any applicable offsets).[15]

To verify Olga's claim that she had no sources of support other than Richard, the superior court ordered Olga to provide the court and Richard with documents that detailed her financial aid package at a college she was attending in California. It also ordered her to provide documentation of any change in her employment or income status.

---

[15]     The superior court identified this amount in the section of its June 20, 2013 order in which it presented its calculations, but in the final portion of that order the superior court substituted the number from its March 29, 2011 order — $1,532.29 — in place of $1,615.63. Olga alerted the superior court to the error, and in its September 19 order, the superior court corrected the error, harmonizing the two sections of the June 20 order.

The superior court rejected Richard's argument that his obligation should be reduced in proportion to any public assistance Olga had received. Noting that the purpose of the I-864 scheme is to prevent the admission of an immigrant likely to become a public charge, the superior court concluded that "[i]f [Olga] did receive means-tested public assistance, it is because the support she received [from Richard was] inadequate."

With regard to Richard's motion for reimbursement of $4,163.60 to offset income Olga allegedly earned and failed to report in 2011, the superior court determined that permitting Richard to offset his current payments would undermine the purpose of the I-864 affidavit. The court reasoned that reducing Richard's payments by the amount necessary for him to recoup his alleged overpayment would mean reducing Olga's support by approximately 25%, leaving Olga without the minimum financial support necessary to prevent her from becoming a public charge. The superior court therefore rejected Richard's request for reimbursement of a portion of his 2011 support payments.

Richard next filed a motion asking the superior court to reconsider its June 20 order and shortly afterward filed a "motion for relief," also in the superior court. He made several overlapping claims in the motions: (1) that he was not obligated to Olga at all, because in fact no I-864 existed; (2) that even if one existed, he could not be liable to her because liability under I-864 depends on the sponsored immigrant receiving permanent-resident status, and there was no evidence Olga had been granted such status; (3) that the parties' premarital agreement, under which the parties allegedly waived any rights to spousal support, barred Olga's claims; (4) that although the superior court had calculated offsets in detail for 2010, it had not done so (but should) for 2009, 2011, 2012, and 2013; (5) that the superior court's order improperly failed to require Olga's now-adult daughter, Linda, to disclose her resources; and (6) that because Linda had not made a claim in court against Richard, he should not be obligated to provide support to her.

The superior court rejected most of the arguments Richard raised in his motions. With regard to Richard's argument that no I-864 existed, the superior court concluded that because Richard stipulated to the findings of fact in the divorce decree — which included the finding that he signed an I-864 affidavit — he was estopped from arguing that he did not sign one. The superior court did not address Richard's argument that the I-864 obligation was dependent on Olga's attaining permanent-resident status, presumably because it considered Richard estopped from challenging his obligation after he stipulated to it in the divorce decree.

The superior court rejected Richard's claim that the parties' premarital agreement preempted the I-864 affidavit. It concluded that the affidavit created a contract between Richard and the federal government, from which Olga was not empowered to release Richard. The superior court also concluded that because Richard stipulated to his I-864 obligation in the divorce decree, he could not now argue that the premarital agreement barred that obligation.

With regard to Richard's offsets arguments, the superior court reviewed documentation Olga submitted about college financial aid and concluded that there was no aid that would reduce Richard's obligations. The superior court did not address Richard's broader claim that it should conduct a full review of offsets for 2009, 2011, 2012, and 2013.

The superior court accepted the premise of Richard's argument that Linda's resources should be considered, and it invited Richard to make a separate motion on this point. It similarly concluded that it would consider the issue of household size at an October 22, 2013 hearing.

**E.    The Superior Court's December 2013 "Final Judgment" Establishing An Accounting And Reporting System**

Richard did not adhere to the superior court's June 20, 2013 order, and on September 19 the superior court again ordered Richard to pay Olga $1,615.63 per month to fulfill his 2013 obligation. On November 8 the superior court reduced Richard's arrears to a judgment, awarding costs to Olga pending confirmation of her expenses. Olga waived the award of costs to speed up the execution of the judgment, and on December 9 the superior court issued a "final judgment" in which it "establishe[d] a new accounting and reporting system to administer the duty of support that has been the subject of so many motions and hearings." Noting that the order represented the fifth time since the beginning of 2012 that Richard had been ordered to pay his support obligation to Olga, the superior court evidently intended that this detailed order would prevent future litigation of Richard's obligation.

The new accounting and reporting system had three elements. First, Olga was required to submit reports disclosing all her household income, including any income earned by Linda as long as the two continued to live together; Richard was required to provide a quarterly report of his support payments and was to make those payments by the first day of each month. Second, Olga's wages were to be verified annually. Pursuant to that requirement, Olga was to execute a document authorizing Richard to access her wage information on file at the California Employment Development Department. Third, the superior court would hold quarterly status hearings, after which it would issue a judgment if it determined that Richard had failed to fulfill his support obligation during the period reviewed at the hearing. The superior court cautioned Richard not to deviate from the court's orders in making payments and instructed him to make an appropriate adjustment of his payments as soon as the new federal poverty guideline for 2014 took effect.

**F.     Richard's Appeal Of The Superior Court's June 2013 Order; The Superior Court's Request For A Limited Remand**

In the meantime, Richard had appealed the superior court's June 20, 2013 order.  During a November status hearing, Richard repeated his argument that the superior court had failed in its June 20 order to provide him with the appropriate offsets against his I-864 obligations for 2011 and 2012.  The superior court notified the parties that it was considering requesting a remand of Richard's appeal to resolve Richard's claims of error.  Over Richard's objection, in January 2014, the superior court requested a remand.[16]  Explaining that "the trial court is a more efficient process for the parties and will provide the Alaska Supreme Court with a more clean record on appeal," the superior court requested a remand so that it could "undertake an accounting of payments and offsets for the years 2011 and 2012 to ensure both that Mr. Villars received every offset to which he was entitled and that Ms. Villars received the annual level of support to which she was entitled."

The superior court indicated in its request for remand that it would calculate offsets only for 2011 and 2012.  Interpreting a federal district court case[17] to mean that "federal law requires [that] the sponsor's obligation to the non-citizen be calculated annually," the superior court indicated that it considered years 2009 and 2010 "closed." The superior court noted that Richard stipulated to his 2009 obligation in the divorce

---

[16]     In his opposition to the request for remand, Richard argued that our conclusions on several issues might limit or make unnecessary the accounting that the superior court indicated that it would undertake.  Among these issues were whether the premarital agreement preempted the I-864 agreement; whether "the requirements to make an I-864 claim [were met]"; whether Olga could receive payments while outside the United States; and whether Richard could be obligated to Olga's adult daughter, Linda, given that Linda allegedly made no claim against Richard.

[17]     *See Shumye v. Felleke*, 555 F. Supp. 2d 1020, 1024 (N.D. Cal. 2008).

decree and that his 2010 obligation was the subject of the remand after this court's decision in *Villars I*. It further noted that it would not address Richard's 2013 obligation as part of its review of offsets because the parties were still actively litigating that obligation.

We granted the superior court's request for a remand while retaining jurisdiction.

**G.    The Superior Court's Evidentiary Hearing And Order On Remand**

After we granted the superior court's request for remand, the superior court held an evidentiary hearing in May 2014. The superior court heard testimony from Olga, Richard, and George Nasif, and reviewed several exhibits submitted by Richard. In an order issued June 3, 2014, the superior court presented its detailed review of Richard's obligations and payments and any applicable offsets for 2011 and 2012.

First, the superior court concluded that for purposes of Richard's I-864 obligation, Olga's daughter, Linda, was a member of Olga's household during 2011 and 2012. In support of this conclusion, the superior court cited the original divorce decree and Richard's stipulation made at the time of that decree to his I-864 obligation.

Second, the superior court determined that the new federal poverty guidelines took effect in February 2011 and February 2012 — and not, as Richard claimed, in March of those years. Based on its conclusions regarding Olga's household size and the effective date of the new federal poverty guidelines in 2011 and 2012, the superior court determined that Richard's obligation was $18,370 for 2011 and $18,868 for 2012.

The superior court then determined how much Richard paid Olga in each of those years. After examining Richard's exhibits, which consisted of check copies, electronic transfer statements, and money orders, the superior court determined that Richard paid Olga $19,902.15 in 2011 and $11,259.25 in 2012.

-13-                                                                          **6964**

Noting our conclusion in *Villars I* that a sponsor must pay only the difference between the immigrant's income and the applicable poverty guideline,[18] the superior court reviewed Olga's other financial resources during those years to determine the amount of any applicable offsets to Richard's obligations. The superior court reversed its earlier determination that Olga's wages in one year could not offset Richard's obligation in a later year, and it accounted for Olga's 2011 wages, finding that she earned $4,163 in 2011 and $3,390 in 2012.

The superior court then addressed Richard's claim that his obligation should be offset by the amount of any Earned Income Tax Credit (EITC)[19] that Olga received. It noted that the relevant immigration statute requires the sponsor to provide support sufficient to maintain the sponsored immigrant at a particular annual "income."[20] It also noted that the accompanying regulations define "income" as "an individual's total income . . . for purposes of the individual's U.S. Federal income tax liability."[21] Citing our decision in *Martin v. Martin*,[22] and noting that the purpose of the I-864 obligation was "to ensure a minimum level of income so that the state does not take on the sponsor's burden," the superior court concluded that any EITC Olga received was not income for purposes of determining any offset to Richard's I-864 obligations.

---

[18]    *See Villars I*, 305 P.3d 321, 325 (Alaska 2013) (quoting *Barnett v. Barnett*, 238 P.3d 594, 598 (Alaska 2010)).

[19]    *See* 26 U.S.C. § 32 (2012) (providing for a refundable tax credit for qualifying low-income wage earners).

[20]    *See* 8 U.S.C. § 1183a(a)(1)(A) (2012).

[21]    8 C.F.R. § 213a.1 (2014).

[22]    303 P.3d 421, 427 (Alaska 2013) (concluding that an EITC received by one parent should not be considered "income" for purposes of calculating another parent's child support obligation).

The superior court also concluded that any food stamps Olga received did not offset Richard's obligation. It observed that although Olga testified that she received food stamps, she also testified that the government later sought reimbursement of that benefit and retained at least part of her income tax refund to satisfy the debt. The superior court concluded that funds that must be repaid are not income, analogizing the food stamps to a loan.

The superior court rejected Richard's argument that he should not owe support for the several months that Olga and Linda spent outside the United States in 2012. It determined that the relevant statute[23] did not indicate that support payments should be terminated or suspended because the immigrant traveled abroad, and that the relevant regulation indicated that the support obligation terminates if the immigrant "[c]eases to hold the status of an alien lawfully admitted for permanent residence and departs the United States."[24] Noting that there was no evidence that Olga had lost permanent-resident status, the superior court concluded that Richard should receive no offset for the time Olga and Linda were abroad.

Accounting for Olga's income but finding that Richard had not established the existence of any additional offsets,[25] the superior court concluded that Richard

---

[23]    8 U.S.C. § 1183a(a)(1)(A).

[24]    8 C.F.R. § 213a.2(e)(2)(i)(C) (2014).

[25]    Richard alleged to the superior court that his obligations should be offset by the amounts of a housing subsidy and educational grant Olga received, but the superior court found that there was no evidence to support the allegations. The superior court also found that although George Nasif paid for Olga and Linda's rent and utilities at some relevant but unspecified time, those amounts were repayments of a loan from Olga to George. Reasoning that Olga "end[ed] up with no more money in her pocket than existed before the loan," the superior court concluded that the repayments from

(continued...)

overpaid in 2011 by $5,695.15 and underpaid in 2012 by $4,218.75, for a net overpayment of $1,476.40. The superior court therefore amended its December 9, 2013 judgment to account for the overpayment, and indicated that "overpaid amounts [would be] deducted from January and February's obligation."[26] But because of apparent discrepancies in Olga's evidence relating to her wages and Linda's wages — including the fact that Olga consistently reported that she was not working but then filed a Social Security document that revealed that she was — the superior court indicated that it would not lift a stay of execution on the judgment until Olga provided confirmation of her wages and Linda's wages for 2013.[27]

In accord with the limited nature of the superior court's request for remand, the superior court's June 3, 2014 order addressed only the 2011 and 2012 obligations.

## H.    Richard's Response To The Superior Court's Order On Remand

Later in June 2014 Richard requested permission to file a response to the superior court's order on remand; Olga did not oppose Richard's request, and we granted his request on July 10, 2014. In his response to the superior court's order on remand, Richard alleged various errors by the superior court. Because some of these claims of error are inextricable from Richard's claims in his opening brief on appeal, we address both sets of claims on appeal in this opinion.

---

[25](...continued)
George were not income.

[26]    The superior court was presumably referring to January and February 2013. The amended judgment that the superior court indicated would be issued simultaneously with its order might clarify this, but that judgment does not appear in the record or other documents before us.

[27]    The superior court evidently agreed with Richard that wages Linda earned after attaining the age of majority reduced Richard's obligation dollar for dollar.

## III. STANDARDS OF REVIEW

"The proper interpretation of a statute presents a question of law that we review de novo, adopting the rule of law most persuasive in light of precedent, reason, and policy."[28]

"We review factual findings for clear error, and will uphold the superior court's findings unless we are left with a definite and firm conviction on the entire record that a mistake has been made, even though there may be evidence to support the finding."[29]

## IV. DISCUSSION

### A. Several of Richard's Arguments Constitute An Improper Collateral Attack on the Divorce Judgment And Are Also Barred By The Rule Against Expanding Issues In Successive Appeals Of The Same Case.

Several of Richard's arguments challenge facts or legal obligations that were settled in the divorce decree. These arguments include the following: (1) that the parties' premarital agreement precludes any claim by Olga for support payments; (2) that Richard did not sign an I-864 affidavit and therefore has no support obligation; (3) that to trigger his support obligation, Olga was required to achieve permanent-resident status but never did so; (4) that his 2009 support payment was excessive because it was calculated using an incorrect formula; (5) that I-864 support may not be ordered prospectively but instead may be ordered only if it is proven afterward that the sponsored immigrant's income was below the relevant income threshold; and (6) that Richard has

---

[28] *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Alyeska Pipeline Serv. Co.*, 262 P.3d 593, 596 (Alaska 2011) (citation and internal quotation marks omitted).

[29] *Simmonds v. Parks*, 329 P.3d 995, 1007 (Alaska 2014) (citation and internal quotation marks omitted).

no obligation to make support payments toward Linda's needs unless Linda makes her own claim against him.

If Richard believed there were errors in the divorce decree, he could have filed a timely appeal. But he did not.[30] Richard also failed to raise these issues at the time Olga moved to enforce the divorce decree with respect to Richard's obligations for the first eleven months of 2010. Instead, in the guise of an appeal challenging one of the superior court's recent orders, Richard in effect is collaterally attacking the original divorce decree, which is now more than five years old. As we have said before, "[t]he remedy for legal error is appeal, not collateral attack."[31]

The findings of fact that were incorporated into the divorce decree — which as noted, Richard could have appealed, but did not — indicate that Richard signed an I-864 affidavit; they also describe in detail his obligations arising from the affidavit. The inclusion of those obligations in the findings of fact presupposes that the obligations were not otherwise barred — for instance, because of the existence of a contrary and controlling premarital agreement, or because Olga had not achieved the required

---

[30]    Richard claims that he noticed errors in the divorce decree as soon as he received it. In his brief he indicates that when he received the divorce decree in the mail, he "immediately not[ed] errors and contact[ed] his attorney." Among the alleged errors was the parties' apparent failure to address the potential applicability of their premarital agreement to Richard's I-864 obligations and an apparent misunderstanding of the formula to be used to calculate those I-864 obligations. But at no point did Richard appeal the superior court's judgment in the divorce case.

[31]    *Wall v. Stinson*, 983 P.2d 736, 741 (Alaska 1999) (citing *Fauntleroy v. Lum*, 210 U.S. 230, 237 (1908)). For example, we have explained that a motion for relief from a judgment or order, *see* Alaska R. Civ. P. 60(b), "is not a substitute for a party failing to file a timely appeal; nor does it allow relitigation of issues that have been resolved by the judgment." *Blaufuss v. Ball*, 305 P.3d 281, 285 (Alaska 2013) (quoting *Cook v. Cook*, 249 P.3d 1070, 1083 (Alaska 2011)) (internal quotation marks omitted); *see also Szabo v. Municipality of Anchorage*, 320 P.3d 809, 814 (Alaska 2014).

permanent-resident status.  Also, the amount of the 2009 support payment was explicitly stated in the findings of fact, along with the formula used to calculate it — 125% of the federal poverty guideline for Alaska.  The findings of fact also explicitly stated that Richard's obligation was prospective, noting that he had the option of dividing his annual obligation into twelve equal monthly installments, which would be due at the beginning of each month.  And the findings of fact explicitly stated that Richard was obligated to support Olga *and* Linda until the specified date, with no provision for Richard's obligation to Linda being conditional upon Linda making her own claim against Richard.  The arguments that Richard now makes relating to these issues were either precisely the issues resolved in the divorce proceeding or were clearly dependent on those same facts.  Permitting Richard to reopen the old case would mean ignoring his decision not to file a timely appeal and would permit him to relitigate these long-resolved issues.[32]

Furthermore, introducing these arguments at this stage violates the well-founded rule against expanding the issues in successive appeals of the same case.  As we said in *State Commercial Fisheries Entry Commission v. Carlson* (*Carlson III*),

> [s]uccessive appeals should narrow the issues in a case, not
> expand them. . . . [A]ll matters that were or might have been

---

[32]     *See Blaufuss*, 305 P.3d at 285-87.  A further reason for rejecting Richard's argument that support payments cannot be ordered prospectively is that the accounting and reporting system that the superior court carefully devised in its December 9, 2013 order provides an adequate procedure to ensure that Richard does not overpay.  The system requires Olga to submit reports disclosing all her household income, including any income earned by Linda as long as the two live together; requires periodic verification of Olga's wages; and permits Richard access to Olga's wage information on file at the California Employment Development Department.  As we discuss below, Richard is entitled to appropriate offsets if a court determines that he overpaid in a given period.  The superior court's quarterly status hearings will permit Richard to address any such overpayment.

determined in a former appeal may not be presented in a subsequent appeal of the same case. The basis for this rule is that [j]udicial economy and the parties' interests in the finality of judgments are in no way furthered if parties are allowed to engage in piecemeal appeals. We have expressed a similar rule in the context of res judicata . . . .[33]

Mindful of our precedents in this area and of the good policy of limiting repetitive and piecemeal litigation, we do not address any argument Richard makes that involves a challenge to a fact or obligation established in the divorce decree that Richard failed to challenge through a timely appeal (or to raise as a defense to Olga's initial motion to enforce the obligation), and that he then declined to address during the first appeal of this case.

## B.     Richard May Be Entitled To Further Offsets.

There are two minor offsets to which Richard may be entitled. Richard argues that the superior court erred when, after the December 8, 2010 hearing, it ordered him to pay I-864 support for December 2010. As Richard notes, the superior court later determined that Olga had received qualifying support in 2010 in excess of Richard's I-864 obligation for that year. Thus, Richard claims, he should be "recompense[d]" $1,458.33, the amount he was ordered to pay following the December 8 hearing.

Because the first appeal in this case related only to the superior court's determination for the first eleven months of that year,[34] Richard has not previously had

---

[33]     65 P.3d 851, 873-74 (Alaska 2003) (internal citations and quotation marks omitted). The rule against expanding issues in successive appeals applies regardless of which party initiated the earlier appeal. In *Carlson III*, we concluded that the State was barred from introducing a defense it raised after the second appeal, even though the third appeal was the first one brought by the State. *Id.* at 874 (declining to address new defense in appeal by the State).

[34]     *See Villars I*, 305 P.3d 321 (Alaska 2013).

an opportunity to litigate or appeal his alleged overpayment for December 2010. We therefore consider his claim here. However, it is not clear on the record before us whether Richard in fact overpaid for that month.[35] We therefore remand to the superior court for this factual determination. If Richard did overpay, the superior court should account for that overpayment by providing Richard with an offset applicable to his current or future obligations, following the sensible approach the superior court has used to balance Richard's overpayment in 2011 against his underpayment in 2012.

Richard may also be entitled to an offset to account for a period of "several months" in 2012 that he claims Olga and Linda spent visiting relatives in Ukraine, during which time he asserts that those relatives supported Olga and Linda. Richard claims that Olga testified telephonically from Ukraine for an August 9, 2012 hearing; he also claims that she testified during that hearing that her family there was supporting her during her visit.

Richard cites no authority for his argument, and we have identified no case in which a court has provided an offset to account for a sponsored immigrant's temporary absence from the United States. The relevant statutes do not specifically provide for such an approach either.[36] But it is clear that the purpose of the support

_____

[35] According to the superior court's recent accounting for 2011 and 2012, it appears Richard made a payment in the amount of $1,458.33 on December 27, 2010. Based on the amounts and timing of the payments listed after this payment and the fact that the superior court included this payment in its calculation for 2011, it appears the payment on December 27 was made to satisfy Richard's obligation for January 2011. Thus, the December 27 payment is presumably not the payment for December 2010 for which Richard now seeks reimbursement. But the superior court is better positioned to determine these facts.

[36] The statute and regulations together provide several conditions, the occurrence of any one of which *terminates* the sponsor's support obligation — but none
(continued...)

obligation to which an immigrant's sponsor commits is to prevent the admission of any immigrant likely to become dependent on public assistance.[37] And it is well established that a sponsor is obligated to pay only the difference between the sponsored immigrant's resources and the appropriate multiple of the poverty guideline — in other words, only that amount necessary to keep the immigrant from turning to public assistance.[38] Thus it is logical that the sponsor's support obligation should be reduced if the immigrant receives alternate support from other sources, including domestic and international family members, if that support meets the definition of "income" for I-864 support obligations.[39]

On the record before us it is unclear whether Olga and Linda received support from family members abroad in 2012 while they were visiting Ukraine. We therefore remand to the superior court for this determination. As with its accounting for

---

[36](...continued)
address a temporary reduction in the obligation due to travel. *See* 8 U.S.C. § 1183a(a)(2)-(3) (2012); *see also* 8 C.F.R. § 213a.2(e)(2)(i)(A)-(D), (e)(2)(ii) (2014). One of these conditions for termination depends on whether the immigrant "ceases to hold the status of an alien lawfully admitted for permanent residence and departs the United States," § 213a.2(e)(2)(i)(C), but that language seems to refer to an immigrant's permanent departure, not a temporary visit abroad.

[37]     *See* 8 U.S.C. § 1182(a)(4)(A) (noting that any alien "likely at any time to become a public charge is inadmissible"); *id.* § 1183a(a)(1)(A)-(C) (stating the required contents of the affidavit that an alien's sponsor must sign to prove that the alien will not become a public charge).

[38]     *See, e.g.*, *Barnett v. Barnett*, 238 P.3d 594, 598 (Alaska 2010).

[39]     As noted previously, the relevant immigration statute requires the sponsor to provide support sufficient to maintain the sponsored immigrant at a particular annual "income." *See* 8 U.S.C. § 1183a(a)(1)(A). The accompanying regulations define "income" as "an individual's total income . . . for purposes of the individual's U.S. Federal income tax liability." 8 C.F.R. § 213a.1.

any overpayment for December 2010, the superior court should follow the same careful and thoughtful approach it used in balancing the under- and over-payments in 2011 and 2012.[40]

### C. Richard Is Not Entitled To An Offset For Any Earned Income Tax Credit Olga May Have Received.

Richard briefly argues that his obligation should be reduced in the amount of any Earned Income Tax Credit (EITC) that Olga received.[41]

As the superior court observed, the relevant statute requires the sponsor to provide support adequate to maintain the sponsored immigrant at a particular "income,"[42] and the regulations define "income" as "an individual's total income . . . for purposes of the individual's U.S. Federal income tax liability."[43]  But an EITC is not income for federal income tax purposes.  The Internal Revenue Code defines "taxable income" as

---

[40]     We do not separately address Richard's argument that he is entitled to an offset to account for Linda's income, if any.  The superior court has explicitly invited Richard to make a motion on this matter, setting out the procedure for him to raise the issue if it is a concern for him.  In its June 3, 2014 order, the superior court indicated that it would address Richard's concern by staying its judgment until Olga provides confirmation of her own income and Linda's income for 2013.  The superior court's decision to stay its judgment pending receipt of adequate documentation of Olga's and Linda's resources also disposes of Richard's argument that the superior court erred by ordering payments during the time that Olga has failed to document her resources.  We therefore do not address Richard's argument on that point.

[41]     *See* 26 U.S.C. § 32 (2012) (providing for a refundable tax credit for qualifying low-income wage earners).

[42]     *See* 8 U.S.C. § 1183a(a)(1)(A).

[43]     8 C.F.R. § 213a.1.

"gross income minus . . . deductions."[44] Gross income is defined as "all income from whatever source derived,"[45] but the Code specifically excludes certain items from the definition,[46] including tax credits.[47] Therefore, an EITC, which is by definition a tax credit, is not "income . . . for purposes of the individual's U.S. Federal income tax liability" and cannot be used to offset Richard's I-864 obligations. The superior court did not err in concluding that any EITC Olga received was not income.[48]

## V.    CONCLUSION

We AFFIRM the superior court's orders rejecting Richard's claims that we have concluded constitute an improper collateral attack on the divorce judgment or are claims that Richard could have raised when Olga first sought enforcement of the divorce judgment or that he could have raised during the first appeal of this case. We also AFFIRM the superior court's order with respect to its conclusion that any EITC Olga received is not income for I-864 obligation offset purposes. We AFFIRM in most respects the remainder of the challenged orders by the superior court but REMAND to the superior court for findings regarding the amount of any offsets to which Richard is

---

[44]    *See* 26 U.S.C. § 63(a) (2012).

[45]    *See id.* § 61(a).

[46]    *See id.* §§ 101-140 ("Items Specifically Excluded from Gross Income").

[47]    *See id.* § 111.

[48]    The superior court reached this conclusion by relying on our decision in *Martin v. Martin*, 303 P.3d 421, 427 (Alaska 2013). But that case has limited relevance here. We held in *Martin* that an EITC received by one parent should not be considered "income" for purposes of calculating another parent's child support obligation. But the basis for our conclusion in *Martin* was not that an EITC is not income for purposes of the individual's federal income tax liability — the relevant issue here — but rather that an EITC is not income for purposes of Alaska Civil Rule 90.3, the Alaska court rule governing child support awards.

entitled as a result of his alleged overpayment for December 2010; any overpayment resulting from support Olga may have received from family members while in Ukraine in 2012; and any offset to account for Linda's income. We do not retain jurisdiction.